JUDGE SULLIVAN

# 13 CV 2073

Daniel J. Kaiser [DK-9387]
KAISER SAURBORN & MAIR, P.C.
111 Broadway
New York, New York 10006
(212) 338-9100



Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x
JENNIFER YANG,

<div style="margin-left:2em">Plaintiff,</div>

    -against-

NAVIGATORS GROUP, INC.,

<div style="margin-left:2em">Defendant.</div>
-------------------------------------------------------------x

**JURY TRIAL DEMANDED**

**COMPLAINT**

       Plaintiff, Jennifer Yang , by her attorneys, Kaiser Saurborn & Mair, P.C., as and for her complaint against the defendant, alleges as follows:

## PARTIES AND VENUE

    1.    Plaintiff, Jennifer Yang ("Yang"), was formerly employed by defendant in the position of Group Chief Risk Officer.

    2.    Defendant, The Navigators Group, Inc. ("Navigators"), is headquartered in Rye Brook, NY.

    3.    Navigators maintains an office at 1 Penn Plaza, New York, New York 10119.

    4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims asserted herein arise under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 78u-6(h)(1)(B).

5.      Venue is properly laid in this District pursuant to 28 U.S.C. § 1391 because it is a

District in which the defendant resides.

6.      This is a whistleblower retaliation case brought by Ms. Yang against her former

employer under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. §

78u-6(h)(1)(B)

## **BACKGROUND FACTS**

**Ms. Yang's Navigators Employment**

7.      On June 25, 2012, Ms. Yang joined Navigators as Group Chief Risk Officer

reporting to Navigators' Chief Financial Officer.

8.      Ms. Yang resigned from her prior employer, which she was employed for more

than five years, as a Vice-President, Regional Capital Management Director in order to pursue

the Navigators' opportunity.

9.      Ms. Yang's unlawful termination from Navigators has badly disrupted her career

and will cause her significant, perhaps irreparable, financial harm.

**Ms. Yang Objected to the Improper Reporting**
**of Risk Assessment of Navigators' Investment**
**Portfolio, Failed ERM Governance, and Lack of Regular**
**Risk Management Processes**

10.     During the first few months, Ms. Yang was learning the company business and

existing enterprise risk management (ERM) practice then developing a plan to improve the ERM

function.

11.     Shortly following the commencement of her employment, Ms. Yang noticed that

in the past Navigators' board presentation and S&P, AM Best rating agencies' presentation, the

market risk assessment of certain investment portfolios appeared low given the asset classes that

Navigators owned.

12. Ms. Yang performed an investigation utilizing outside investment consultants.

13. Two major findings emerged from Ms. Yang's investigation. 1) The software tool the outside consultant (Diane Coogan from Queens College, City University of New York) utilized should not have been presented to a third party. By presenting the results to S&P, AM Best, and Navigators Group Board of Directors, Navigators exposed itself to liability for violating the software license; and more importantly 2) the risk models used for certain asset classes were grossly improper.

14. For example, the model for municipal bonds did not account for callable features and the models for structured finance products ignored the underlying collaterals which substantially underestimated the investment risks. These two asset classes accounted for about 60% of Navigators' investment portfolio.

15. Ms. Yang communicated her findings and expressed her concerns to Ciro De Falco, Navigators' Chief Financial Officer and Ms. Yang's manager, during a meeting with him in July 2012. Investment risk is one of Mr. DeFalco's responsibilities.

16. Ms. Yang recommended alternatives to correctly assess the market risk.

17. Mr. DeFalco ignored Ms. Yang's concerns insisting that risk was being properly assessed.

18. Ms. Yang, however, continued to make efforts to address her concerns including acquiring the correct resources to properly assess market risk.

19. During late July or early August, Mr. DeFalco attempted to include the improper market risk assessment results in a report for the upcoming Navigators Board meeting in August.

20.     Ms. Yang cautioned Mr. DeFalco that the improper risk assessment material should not be forwarded to the Board.

21.     Mr. DeFalco's abrupt and dismissive reply was that her concerns were expressed too late.

22.     Ms. Yang, as the Group Chief Risk officer, requested that she attend the Board Finance Committee meeting where investment risks are discussed. Mr. DeFalco declined her request even though in the past the prior Chief Risk Officer was invited to the Board Finance Committee meeting.

23.     Additionally, during this past summer, Ms. Yang learned that five management committees existed that shared responsibility for risk management for Navigators Group.

24.     They were the Group Enterprise Risk Management (ERM) Steering Committee and four sub-risk committees, including Underwriting and Claims Risk Committee, Compliance and Governance Risk Committee, Finance and Credit Risk Committee, and Operational Risk Committee.

25.     Ms. Yang chaired the ERM Committee which consists of nearly all of the senior Navigators executives including the CEO who attended as a permanent guest. Ms. Yang noticed that reserving risk, one of the most significant risks faced by an insurance company, was not the responsibility of any sub-committee.

26.     Ms. Yang also learned that the Underwriting and Claims Risk Committee had not met for a long time and was out of compliance with its charter. The Finance Risk Committee had not met for nearly a year. She further determined that Credit Risk from reinsurance recovery (over $1 billion) and investments (over $1 billion) was not discussed at any of the risk committee

4

meetings. Ms. Yang reported her findings to Mr. DeFalco.

27.     In late August, Clay Bassett, Chief Underwriting Officer and prior Chief Risk

Officer, accused Ms. Yang of inviting questions from Navigators Board members during a

meeting regarding Emerging Risk management, which was assessed as being weak by S&P.

However, Ciro DeFalco sent an email right after the same board meeting praising Ms. Yang's

performance in the board meeting.

28.     During the same meeting, Mr. Bassett reminded Ms. Yang that she represented

the interests of Management in front of the Navigators Board.

29.     Ms. Yang responded that she was obligated to present risk information in a

truthful manner and that she had fiduciary obligations to the company and its shareholders. Ms.

Yang later shared the bleak ERM state, challenges she faced, and the need to be truthful to the

board despite the pressure from other executives with UK Syndicate colleagues when Ms. Yang

was visiting UK Syndicate business in October 2012.

30.     In September 2012, Ms. Yang raised concerns to Mr. DeFalco that Navigators did

not possess the proper skill sets to manage the market and credit risks and, further, that some

sub-risk committees were out of compliance.

31.     Ms. Yang proposed solutions to these very serious risk management issues,

including the hiring of additional personnel with the right credentials and professional

qualifications.

32.     Further, Ms. Yang advised both Mr. DeFalco and Mr. Bassett that the market risk

appetite was much too high to justify in order to maintain an A rating from S&P.  Also, the

market risk appetite (20% of shareholders equity, ~$170 million as of June 30, 2012) was

inconsistent with the capital buffer ($80 million) Navigators wants to maintain.

33.     Ms. Yang noted that the current aggregate catastrophe risk for Navigators was at the limit of or beyond the company's risk appetite, an observation which angered Mr. Bassett.

34.     When Ms. Yang and Mr. Scott Eisdorfer, Chief Administrative Officer, repeatedly requested information from Mr. Bassett and Mr. DeFalco in order to develop action plans to address S&P's concerns on Navigators' weak Operational Risk Control, Mr. Bassett and Mr. DeFalco never provided the requested additional information.

35.     Ms. Yang became very concerned that lack of regular risk management reporting/control processes and Navigators' high aggregated risks potentially jeopardize Navigators' "A" rating from S&P due to its thin capital buffer above the required capital amount. Rating downgrade from S&P would cause significant financial damage to some lines of business.

36.     When Ms. Yang shared her concerns on rating downgrade with Mr. DeFalco, Mr. DeFalco dismissed Ms. Yang's concern and said the rating downgrade would not be the end of the world.

37.     Ms. Yang also shared her concerns on rating downgrade and the challenges she faced to have other executives properly managed the risks with Mr. Vincent Tizzio, President and CEO of Navigators Management Company. Ms. Yang asked for help from Mr. Tizzio to improve risk management practice.

38.     Mr. Tizzio stressed that rating downgrade would cause significant damages to the business and made the statement that whoever thought rating downgrade was not a serious matter should be fired. Mr. Tizzio further agreed to use his monthly management meeting as a forum to discuss emerging risk and other risk matters.

39.     In September 2012, one week prior to the scheduled Group ERM Steering Committee meeting, Mr. DeFalco instructed Ms. Yang to cancel the meeting because he and Mr. Bassett had not completed their assignments from the prior meeting.

40.     Ms. Yang advised him that was not possible because the committee would then be out of compliance. Mr. DeFalco then requested that the agenda items requiring that he and Mr. Bassett report be postponed.

41.     Ms. Yang's persistent requests to hold Underwriting and Claims Risk Committee meeting and properly manage the underwriting and claims risk greatly angered Mr. Basset.

42.     Mr. Basset accused Ms. Yang of improperly pressuring him by mentioning Stan Galanski's name (Navigators Group CEO) in one of Ms. Yang's emails to Mr. Bassett.

43.     Mr. Bassett further accused Ms. Yang of turning the Group ERM Steering Committee meeting into battle grounds by showing quantitative results and sharing ERM Level II Report from S&P, which identified weakness in numerous risk control areas.

44.     Mr. Basset further threatened Ms. Yang that he would watch Ms. Yang very closely.

45.     It took Ms. Yang three months' persistent effort to push Mr. Bassett to hold Underwriting and Claims Risk Committee meeting.

46.     The meeting was finally held on October 25 by Mr. Bassett, only after Ms. Yang worked out an alternative solution with Mr. Vincent Tizzio, President and CEO of Navigators Management Company to address the emerging risks arisen from underwriting.

47.     Despite Ms. Yang's persistent effort to push Mr. DeFalco to hold Finance Risk Committee meeting, the meeting was yet to be held till the date Ms. Yang was terminated. Mr.

DeFalco further recommended reducing the meeting frequencies of risk committees from the minimum of six (6) times a year to four (4) times a year, citing no time for the ERM committee meetings.

48. Navigators rely on the risk committees to properly identify, measure, report, and monitor risks. Reducing the meeting frequencies of risk committees would further deteriorate the ERM control processes.

49. In October 2012, the investment consultant (Ms. Diane Coogan) and the investment manager GR-NEAM provided Ms. Yang the risk assessment results for the Navigators' investments as of June 30, 2012. GR-NEAM's risk assessment of market risk VaR $95 million (1 year, 99% confidence level) was more than double that of Ms. Diane Coogan ($40 million).

50. Diane Coogan's market risk assessment, which was presented to the Navigators Board and the rating agencies in the past, grossly underestimated the market risk from Navigators' investment portfolio.

51. The market risk of Navigators' investment alone, while well within Navigators' risk appetite statement, could potentially decrease Navigators' capital by $95 million, more than the capital buffer ($80 million) Navigators holds above its target capital level, thus jeopardize Navigators' "A" rating from S&P. This was due to the inconsistent risk appetite defined in the Navigators' risk appetite statement.

52. During an October meeting with Bruce J. Byrnes, Navigators' General Counsel who is responsible for compliance and governance risk matters, Ms. Yang shared her concerns regarding the compliance issues involving the sub-risk committees. She also communicated her

8

frustrations that Mr. DeFalco and Mr. Bassett repeatedly canceled/postponed her meeting requests to discuss ERM related issues.

53.     Ms. Yang discussed her concerns of the company lacking regular risk reporting and monitoring with Internal Audit Director Heather Jasontek. Heather confirmed that there were no regular risk reporting or monitoring against Navigators Risk Appetite Statement. Risk Appetite Statement should define the boundary of the risks Navigators take to pursue its goals. It is also viewed by rating agencies and the board as an important part of risk management control.

54.     In the rating agencies presentation, Navigators stated that Internal Audit had been a very important part of Risk Management program to ensure risks are properly managed. In reality, there were no reports or monitoring to ensure the risks were within the company's Risk Appetite Statement.

55.     On October 25, 2012, Ms. Yang forwarded the market risk assessment from GR-NEAM to both Mr. DeFalco and Stan Galanski, Navigators' CEO, for their review. Mr. DeFalco responded with rage stating that Ms. Yang's work product was not fully vetted by him and requested that Mr. Galanski ignore the results. Mr. DeFalco further accused Ms. Yang of utilizing an investment consultant without his clearance.

56.     This was untrue. Ms. Yang has discussed numerous times with him the use of the investment consultant (Ms. Diane Coogan) and the investment manager GR-NEAM for market risk assessment. Mr. DeFalco was well aware of and encouraged the use of this consultant and GR-NEAM.

57.     In the morning of October 26, 2012, Mr. DeFalco asked Ms. Yang not to share any information with Mr. Galanski without his permission as Mr. Galanski would read the

9

information and ask questions.

58.    On October 26, 2012, Ms. Yang included the market risk assessment results from

GR-NEAM in the Group ERM Steering Committee meeting material.

59.    Mr. DeFalco, despite the GR-NEAM risk assessment, stated that he was not

concerned with the market and credit risk. He provided no support for his lack of concern. A

heated debate over the risk measurement matrix (exposure/probability vs. exposure/degree of

control) during the meeting further underscored some executives' lack of fundamental

understanding of risk measurement.

60.    During the period of October 31, 2012 through November 2, 2012, Ms. Yang was

preparing an ERM report for the Navigators Group Board of Directors meeting per Bruce

Byrnes's previous request for the December board meeting. Ms. Yang intended to report to the

Board: 1) that market risk assessment results previously presented was grossly underestimated,

employing faulty models and tools; 2) the GR-NEAM report estimated the risk at more than

double than what was previously estimated, while it was within the risk appetite but could

potentially jeopardize Navigators' "A" rating from S&P; 3) certain sub-risk committees were not

in compliance and the risks assigned to these committees were not properly managed; 4) the

prior risk management governance structure did not include reserve risk and other risks; 5) risk

reports were not generated nor monitored to ensure risk exposures are within the company's risk

appetite; 6) lack of regular risk management control processes and Navigators' high aggregated

risks potentially jeopardize Navigators' "A" rating from S&P; and 7) heightened concerns with

the resistance from executive team for ERM initiatives and risks were not properly managed.

**Ms. Yang is Retaliated Against for her
Opposition to Navigators' Faulty Risk Assessment
Corporate Behaviors**

61.     Without any warning, on November 2, 2012, Ms. Yang was advised by Mr.

DeFalco that she was terminated.

62.     The only explanation Mr. DeFalco provided was that Ms .Yang did not fit into

"Navigators' culture."

63.     Mr. DeFalco's explanation was true in so far as Ms. Yang insisted on meeting her

fiduciary responsibilities.

64.     She insisted on identifying, measuring, reporting, and monitoring all the risks and

possessed the necessary resources to accurately and timely carry out risk management duties.

65.     Navigators' senior executives were not interested in accurate risk assessment, and

in that sense, Ms. Yang did not conform to Navigators' culture.

66.     Defendant understood that it was underestimating risk and failing to follow proper

risk control procedures.

67.     Defendant intentionally concealed its improper risk control procedures and

improper assessments of investment risk from the public and its shareholders.

68.     The company played fast and loose with enterprise risk management, which was

also evidenced by changing the Chief Risk Officer (CRO) reporting structure from CEO to CFO

prior to the hiring of Ms. Yang, and Ms. Yang would not cooperate in these unlawful practices.

69.     Navigators' risk control practices constituted shareholder fraud and violated U.S.

securities rules and regulations.

70.     Plaintiff reasonably and in good faith believed that the improper risk control practices engaged in by defendant constituted shareholder fraud and violated U.S. Securities Law and related rules and regulations. Plaintiff complained to Navigators' General Counsel, Chief Financial Officer, Internal Audit Director and intended to report the improper risk control practices to Navigators Board and the Board's Committees in the upcoming board meetings in early December 2012.

71.     Plaintiff was terminated in retaliation for her complaints and objections to defendant's improper and fraudulent risk control practices as well as fear of her reporting the true Enterprise Risk Management status to the board of directors.

### FIRST CAUSE OF ACTION

72.     Pursuant to Fed. R. Civ. P. 10(c), plaintiff repeats and realleges each and every allegation contained in paragraphs "1" through "71" as if repeated and incorporated herein.

73.     Defendant's conduct set forth in this Complaint violated the Securities Exchange Act of 1934 including but not limited to 15 U.S.C.A. §§ 78m and 78dd-1 *et. seq.*

74.     Defendant terminated plaintiff because of her objections and complaints about defendant's improper risk assessments and improper risk control procedures.

75.     By reason of the foregoing, Navigators has violated 15 U.S.C. § 78u-6(h)(1)(B) thereby causing Liu damages.

### PLAINTIFF HEREBY DEMANDS A TRIAL BY JURY

**WHEREFORE**, plaintiff hereby demands judgment against defendant as follows:

(i)     On her first cause of action, assessing compensatory damages including (a) lost past and future earnings, bonuses, and equity awards; (b) double Ms. Yang's lost back pay, plus

interest;  (c) reimbursing Ms. Yang for her litigation costs, expert witness fees and attorneys'

fees; and (d) reinstatement of  Ms. Yang to Group Chief Risk Officer position.

      (ii)    For such further relief as the Court deems just and proper.

Dated:   New York, New York
          March 28, 2013

                            **KAISER SAURBORN & MAIR, P.C.**
                            Attorneys for plaintiff

By:                                       
                            Daniel J. Kaiser [DK-9387]
                            111 Broadway
                            New York, New York 10006
                            (212) 338-9100

13